# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**PETER M. RACHER**
**STEPHANIE T. ECKERLE**
**JOSH S. TATUM**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

Squaw Creek Coal Company:

**E. SEAN GRIGGS**
**DAVID R. GILLAY**
Barnes & Thornburg LLP
Indianapolis, Indiana

Indiana Department of Natural Resources:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**FRANCES BARROW**
Deputy Attorney General
Indianapolis, Indiana

FILED
Mar 21 2012, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| BIL MUSGRAVE, | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 49A05-1104-MI-164 |
| | ) |
| SQUAW CREEK COAL COMPANY and | ) |
| INDIANA DEPARTMENT OF NATURAL | ) |
| RESOURCES, | ) |
| | ) |
| Appellees-Petitioners. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Michael D. Keele, Judge
Cause No. 49D07-1001-MI-3153

**March 21, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Bil Musgrave ("Musgrave"), a former coal miner, appeals the trial court's order in favor of Squaw Creek Coal Company ("SCCC") and the Indiana Department of Natural Resources ("DNR") on SCCC's petition for judicial review. SCCC petitioned the trial court for judicial review of an order issued by an Indiana Natural Resources Commission ("Commission") Administrative Law Judge ("ALJ") vacating the DNR's decision to release certain portions of SCCC's reclamation bond on its surface mining permit, and the trial court reversed. The DNR cross-appeals the trial court's order. We affirm.

## Issues

The parties raise several issues for our review, which we consolidate and restate as the following three issues:

I.   Whether the trial court erred by denying Musgrave's motion to dismiss SCCC's petition for judicial review for lack of jurisdiction because SCCC did not serve summonses upon the Commission, the DNR, and the Indiana Attorney General, and did not pay the Marion County Superior Court filing fee;

II.  Whether Musgrave is collaterally estopped from challenging the DNR's decision to release the reclamation bond at issue; and

III. Whether the trial court erred by reversing the ALJ's order and remanding for entry of judgment in favor of SCCC and the DNR.

2

**Facts and Procedural History**

SCCC was formed in 1960 as a joint venture between Alcoa, Inc. and Peabody Coal Company to mine the coal from Squaw Creek Mine. The extracted coal was used to power Alcoa's nearby aluminum production facility on the banks of the Ohio River. Musgrave is a former miner who worked at Squaw Creek Mine.

The Squaw Creek Mine was mined in segments using a method called "surface mining." (App. 636) Using this method, SCCC drilled and blasted the overburden[1] that covered the coal, removed the blasted and drilled pieces with draglines and shovels, and dumped the pieces to the side, making "structureless pile[s] of debris" (App. 692) that ranged from twenty-five to eighty feet tall. The exposed coal was then extracted and transported to a processing area using "haul roads" that were approximately fifty feet wide and inclined because the mine floor was well below the original grade of the land. (App. 636)

Between 1965 and 1979, Alcoa used abandoned haul roads in Squaw Creek Mine to dispose of waste generated at its aluminum production facility, such as chromium sludge, spent pot lining, and tarry wastewater and tars from tunnel kilns. Because the haul roads were lower than the surrounding spoil, the waste was dumped at relatively low levels. Alcoa dumped its wastes in coordination with the Indiana Department of Health, the predecessor to the Indiana Department of Environmental Management (IDEM), and the wastes were covered with native overburden. It is estimated that Alcoa dumped its waste at twelve locations in Squaw Creek Mine, but some former miners assert that waste was dumped in

---

[1] Overburden is material of any nature except topsoil that overlies a coal deposit. 312 IAC § 25-1-93.

3

several additional locations.

On March 28, 1984, SCCC obtained Permit S-008 to mine a certain area of Squaw Creek Mine's North Field. The entire area covered by Permit S-008 is approximately 4,467 acres, 1,273.01 acres of which were actually mined. Successful reclamation of the land that was mined was secured with a bond.

All active mining at Squaw Creek Mine ended in 1987, and on October 26, 2007, SCCC applied for release of certain portions of the bond on Permit S-008. The DNR held a public hearing on the bond release petition on January 3, 2008 at which Musgrave and other concerned citizens testified, as did an Alcoa safety representative. Much of the hearing focused on Alcoa's disposal of the waste, whether all disposal locations had been discovered, and the various health and environmental impacts that the waste disposal has allegedly had on Squaw Creek Mine. On January 4, 2008, the DNR conducted a field investigation of the area covered by the bond and approved SCCC's bond release application on February 1, 2008. In approving the bond release, the DNR concluded that "[t]he actual or theoretical threat of pollution from industrial wastes is not the type of impact anticipated by the bond release requirements." (App. 96)

On February 15, 2008, Musgrave sought administrative review of the DNR's decision from the Commission. After the parties filed several motions and participated in multiple conferences, Musgrave moved for summary judgment on April 3, 2009. SCCC and the DNR filed responses and cross motions for summary judgment on June 25, 2009 and June 26, 2009, respectively.

4

On December 28, 2009, the ALJ issued an order affirming the DNR's decision to release parts of the bond on certain portions of SCCC's reclamation bond, but vacating the DNR's decision to affirm the release on others.[2] Although the ALJ concluded that none of the identified sites where Alcoa dumped waste were located within the bonded area, the ALJ vacated the DNR's decision as to certain portions of land because she concluded that "the migration of waste or constituents of that waste from the disposal sites throughout [Squaw Creek Mine] and possibly beyond is facilitated by the permeable overburden layer created throughout [Squaw Creek Mine] by SCCC's mining operations." App. 69. The ALJ based this conclusion on evidence that the mining spoil was behaving as an "unconfined aquifer" (App. 748) where lateral migration of water occurs.

SCCC sought judicial review of the ALJ's order by filing its Verified Motion for Judicial Review in Marion County Superior Court on January 22, 2010. That same day, SCCC sent a copy of its petition for judicial review to Musgrave, the Indiana Attorney General, the DNR, and the Commission. It also sent a summons with the petition sent to Musgrave. SCCC did not send summonses to the Attorney General, the DNR, or the Commission.

On January 27, 2010, Attorney April Lashbrook of the Indiana Attorney General's Office entered an appearance on behalf of the DNR. On February 8, 2010, Attorney Peter Racher entered an appearance on behalf of Musgrave. Then, on March 17, 2010, Attorneys

---

[2] As we discuss below, bonds on reclamation permits are released in three phases. Each phase requires satisfaction of certain criteria before it may be released. In its bond release application, SCCC applied for phase I release on some parts of the land, phase II release on other parts, and phase III release on yet other parts. The ALJ affirmed the DNR's decision to release the bond on the land that SCCC requested phase I and phase II releases. The ALJ vacated the DNR's approval on the land for which phase III release was requested.

5

Peter Racher and Stephanie Eckerle filed an "Amended Limited Appearance by Attorneys in a Civil Case" (App. 98) as well as a motion to dismiss SCCC's petition for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficiency of process, insufficiency of service of process, and failure to state a claim upon which relief may be granted. The trial court denied Musgrave's motion to dismiss on May 26, 2010.

The parties briefed the issue of whether the ALJ properly reversed the DNR's decision on phase III release of the bond, and the trial court held oral argument on December 16, 2010. On March 11, 2011, the trial court issued its "Order on Verified Petition for Judicial Review" reversing the ALJ's order and remanding for entry of judgment in favor of SCCC and the DNR.

Musgrave now appeals. Additional facts will be supplied as necessary.

**Discussion and Decision**

The Trial Court's Jurisdiction

We first address Musgrave's argument that the trial court should have dismissed Musgrave's petition because it lacked jurisdiction to review the ALJ's order. Specifically, Musgrave maintains that SCCC committed certain errors in petitioning for judicial relief, namely that it did not serve summonses upon the Commission, the DNR, and the Indiana Attorney General with its petition; did not name the DNR and Attorney General as parties on the summons it served upon Musgrave; and did not pay a filing fee in Marion County Court. According to Musgrave, as a result of these alleged errors, SCCC's petition for judicial review was untimely and thus the trial court should have dismissed SCCC's petition.

6

Decisions concerning surface coal mining and reclamation under Indiana Code article 14-34 are subject to judicial review under the Indiana Administrative Orders and Procedures Act (AOPA). Ind. Code § 14-34-17-1. AOPA "establishes the exclusive means for judicial review of an agency action." I.C. § 4-21.5-5-1. Judicial review of an administrative order is initiated by filing a petition for review in the appropriate court. I.C. § 4-21.5-5-2. A person is entitled to judicial review only if that person has standing, has exhausted administrative remedies, files a petition for review within thirty (30) days after the date that notice of the agency action is served, and timely transmits the agency record. I.C. § 4-21.5-5-2(b). The petition must be filed with the clerk of the court, be verified, and contain certain information. I.C. § 4-21.5-5-7. In addition:

> A petitioner for judicial review shall serve a copy of the petition for judicial review upon:
>
> > (1) the ultimate authority issuing the order;
> >
> > (2) the ultimate authority for each other agency exercising administrative review of the order;
> >
> > (3) the attorney general, and
> >
> > (4) each party to the proceeding before an agency;
>
> in the manner provided by the rules of procedure governing civil actions in the courts.

I.C. § 4-21.5-5-8.

We first turn to Musgrave's argument that the summons he received was defective and that SCCC did not send summonses to the DNR, Attorney General, or the Commission. The parties dispute the meaning of AOPA's directive to serve the petition for judicial review "in

7

the manner provided by the rules of procedure governing civil actions." I.C. § 4-21.5-5-8. Musgrave argues that it refers to the Indiana Trial Rules' requirements governing process and service for the commencement of a new civil action which require a summons along with the complaint. Under Indiana Trial Rule 3, a party commences a civil action by filing the complaint or equivalent pleading specified by statute, paying a prescribed filing fee, and, where service of process is required, furnishing the clerk with as many copies of the complaint and summons as is necessary. Trial Rule 4, entitled "Process", addresses the various requirements of the form and content of a summons. Trial Rules 4.1 through 4.17 govern how that process (the summons and complaint) is served, depending on the type of party to be served or the method by which service is to be effected.

SCCC, on the other hand, argues that it needed only to serve the petition for judicial review and did not need to include a summons. Working from the position that judicial review of an administrative order is merely the continuation of an ongoing dispute, SCCC's argues that AOPA's reference to the trial rules means rules governing actions already commenced.[3] Trial Rule 5 governs the service of subsequent pleadings and papers, such as written motions, pleadings subsequent to the original complaint, written motions, briefs, documents related to discovery, and other written notices.

Both parties attempt to support their position here by directing us to our opinion in Lindsey v. De Groot Dairy LLC, 867 N.E.2d 602 (Ind. Ct. App. 2007), trans. denied. In that

---

[3] In its brief, SCCC explains that the person who assisted in filing the petition saw Musgrave's name in the caption and, out of familiarity and "perhaps overzealously", prepared and sent a summons to Musgrave. Appellee's Br. p. 22.

case, we addressed whether the service of a summons and the petition for judicial review on a party's attorney, rather than the party himself, met the service requirements of AOPA. We concluded that it did, and wrote that "service pursuant to Trial Rule 5 satisfies Indiana Code Section 4-21.5-5-8" and that "[i]f the General Assembly would prefer service be achieved under Trial Rule 4, it should so specify." Id. at 605.

Musgrave, however, presents a slightly different issue here in that his challenge is one of insufficiency of process, not insufficiency of service of process. A claim of insufficiency of process is a challenge to the content of a summons, whereas a challenge of insufficiency of service of process challenges the manner or method of service. Cotton v. Cotton, 942 N.E.2d 161, 164 (Ind. Ct. App. 2011). Musgrave does not argue that SCCC sent its petition to the wrong person. Nor does he argue that SCCC incorrectly sent the petition or otherwise deficiently served the petition. Rather, Musgrave takes issue with the content of his summons and the fact that no summons was sent to DNR, the Commission, and the Attorney General.

AOPA states that a party shall serve "a copy of the petition for judicial review" and says nothing of a summons. The petition is therefore the only process required by AOPA.[4] Just like Trial Rule 4, Indiana Code Section 4-21.5-5-7 lists the content requirements of the process (the petition) necessary under AOPA. Service of this process is then to be achieved in the manner provided for under the trial rule relevant to the particular party to be served, be

---

[4] This makes sense because AOPA requires service of the petition on the "ultimate authority issuing the order." Practically speaking, there is no need to serve a summons on the ALJ that contains, among other things, "the time within which these rules require the person to be served to respond, and a clear statement that in case of his failure to do so, judgment by default may be rendered against him for the relief demanded in the complaint." T.R. 4(C)(5).

it on an individual, organization, the Attorney General, or through a party's attorney. See De Groot, 867 N.E.2d at 605.

Here, the ALJ issued her order on December 28, 2009. SCCC filed its Verified Motion for Judicial Review in Marion Superior Court less than thirty days later on January 22, 2010. That same day, SCCC sent a copy of its petition to Musgrave, the Indiana Attorney General, the DNR, and the Commission. SCCC's process and service thereof was sufficient.

Similarly, we find no error in the trial court's refusal to dismiss SCCC's petition even though it did not pay a filing fee. AOPA makes no mention of a filing fee. Even if we were to accept Musgrave's interpretation of AOPA's language, Trial Rule 3 merely requires that a party pay the "prescribed filing fee." The Marion Superior Court prescribed no filing fee in this case and SCCC should not be penalized for not paying a filing fee that it was never required to pay. The trial court did not err by refusing to dismiss.

Issue Preclusion

Both SCCC and the DNR argue that Musgrave is collaterally estopped from challenging the bond release on Permit S-008 because he challenged the bond release on another permit, S-009, raising the same legal issues. In general, collateral estoppel, or issue preclusion, bars subsequent litigation of a fact or issue that was necessarily adjudicated in a former suit if the same fact or issue is presented in a subsequent lawsuit. Indianapolis Downs, LLC v. Herr, 834 N.E.2d 699, 704 (Ind. Ct. App. 2005), trans. denied. Where issue preclusion is applicable, the former adjudication will be conclusive in the subsequent action even if the two actions are different claims. Id. However, the former adjudication will only

10

be conclusive as to those issues that were actually litigated and determined therein. Id. Issue preclusion does not extend to matters that were not expressly adjudicated and can be inferred only by argument. Id.

In order for a matter to have been "necessarily adjudicated" such that issue preclusion applies, the determination must have been essential to the decision. Watson Rural Water Co. v. Indiana Cities Water Corp., 540 N.E.2d 131, 137 (Ind. Ct. App. 1989), trans. denied. Moreover:

> If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone…
>
> [A] determination in the alternative may not have been as carefully or rigorously considered as it would have if it had been necessary to the result, and in that sense it has some of the characteristics of dicta…
>
> There may be cases where, despite these considerations, the balance tips in favor of preclusion because of the fullness with which the issue was litigated and decided in the first action. But since the question of preclusion will almost always be a close one if each case is to rest on its own particular facts, it is in the interest of predictability and simplicity for the result of nonpreclusion to be uniform.

Restatement (Second) Judgments § 27, cmt. i.

The ALJ wrote the following in dismissing the Musgraves'[5] challenge to the release of the bond on Permit S-009:

> 30.  However, the Musgraves [sic] complaint focuses on matters that are either outside the scope of the bond release relating to Squaw Creek's Permit # S-009 *or* are outside the control or jurisdiction of the Department, the Commission or the administrative law judge.

_____

[5] Both Musgrave and his wife challenged the release of the bond on Permit S-009.

* * * * *

37.    Therefore, the Department is without authority to deny bond release on Permit # S-009 as a result of activities that allegedly occurred within the permit area covered by Permit # S-008 or for the purpose of facilitating the remediation of contamination resulting from activities that allegedly occurred within the permit area covered by Permit # S-008.

38.    In the event it were appropriate for the Department to deny any bond release relating to the Musgraves' complaint of toxic dumping and the resulting contamination it would have to be the bond related to Permit # S-008, not the bond posted on Permit # S-009.

* * * * *

47.    The Musgraves' complaint fails to state a claim upon which relief may be granted for two reasons.  First, the complaint relates to activities within the permit area of Permit # S-008, which is not the subject of bond release at issue in this proceeding.  Second, the relief sought is the remediation of contamination resulting from alleged past toxic dumping, which is not within the jurisdiction of the Department, the Commission or the administrative law judge.

DNR App. 1-6.

The ALJ's decision was clearly based upon two separate but individually sufficient grounds.  The first was that the complaint challenged the release of the bond on Permit S-009 based on activities within the area covered by Permit S-008.  The ALJ could have dismissed the Musgraves' action without more.  However, it went on to state that neither the DNR nor the Commission had jurisdiction to grant the requested relief over the waste that was dumped.  This, too, could have independently supported dismissal.  Because the jurisdictional question was one of two separate but independently sufficient grounds for dismissal, we cannot conclude that it was necessarily adjudicated in the prior proceeding.  Consequently, it

12

cannot be the basis of issue preclusion, and the trial court was correct to conclude that Musgrave is not collaterally estopped from challenging the release of the bond on Permit S-008.

<u>Release of the Bond</u>

*Standard of Review*

We now turn to the trial court's order on SCCC's judicial review petition. When we review the decision of an administrative agency, we are bound by the same standard as the trial court. <u>Indiana Dep't of Natural Res. v. Hoosier Envtl. Council, Inc.</u>, 831 N.E.2d 804, 808 (Ind. Ct. App. 2005). We do not try the case de novo and do not substitute our judgment for that of the agency. <u>Id.</u> Pursuant to AOPA, we will reverse the administrative decision only if it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. I.C. § 4-21.5-5-14; <u>also</u> <u>Hoosier Envtl. Council, Inc.</u>, 831 N.E.2d at 808. While an appellate court grants deference to an administrative agency's findings of fact, no such deference is accorded to its conclusions of law. <u>LTV Steel Co. v. Griffin</u>, 730 N.E.2d 1251, 1257 (Ind. 2000). The burden of demonstrating the invalidity of the agency action is on the party who asserts the invalidity. <u>Dep't of Natural Res. v. Peabody Coal Co.</u>, 740 N.E.2d 129, 134 (Ind. Ct. App. 2000).

The ALJ's order was entered on cross motions for summary judgment. In an

administrative proceeding, a party may, at any time after the matter has been assigned to an administrative law judge, move for a summary judgment in the party's favor as to all or any part of the issues in the proceeding. I.C. § 4-21.5-3-23. When a party files a summary judgment motion, the administrative law judge considers the motion as a court would if considering a motion for summary judgment filed under Trial Rule 56.

Pursuant to Indiana Trial Rule 56(C), summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." Mahan v. American Standard Ins. Co., 862 N.E.2d 669, 675 (Ind. Ct. App. 2007) (quoting Scott v. Bodor, Inc., 571 N.E.2d 313, 318 (Ind. Ct. App. 1991)), trans. denied. The party moving for summary judgment bears the burden of making a prima facie showing that there is no genuine issue of material fact and that he or she is entitled to a judgment as a matter of law. Indiana-Kentucky Elec. Corp. v. Comm'r, Ind. Dep't of Envtl. Mgmt., 820 N.E.2d 771, 776 (Ind. Ct. App. 2005). Once the moving party meets these two requirements, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact by setting forth specifically designated facts. Id.

The fact that the parties made cross-motions for summary judgment does not alter our standard of review. Mahan, 862 N.E.2d at 676. Instead, we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. Id.

14

*Indiana Surface Mining Control and Reclamation Act*

The United States Congress has acknowledged that coal mining operations contribute significantly to the energy requirements of the United States, and that surface coal mining is an appropriate method of obtaining the natural resource. Natural Resources Comm'n of Ind. v. AMAX Coal Co., 638 N.E.2d 418, 419 (Ind. 1994). However, recognizing the negative environmental impacts and the public health and safety hazards associated with surface mining operations, Congress adopted the federal Surface Mining Control and Reclamation Act of 1977. Id. Indiana's counterpart to F-SMCRA, the Indiana Surface Mining Control and Reclamation Act (I-SMCRA), similarly recognizes the need to protect society and the environment and assure the rights of surface land owners and others by preventing and minimizing the adverse effects of surface mining operations. Id.

I-SMCRA is codified at Indiana Code Article 14-34. Pursuant to I-SMCRA, a person may not open, develop, or operate a new or previously mined or abandoned site for surface coal mining in Indiana without holding a valid surface coal mining and reclamation permit. I.C. § 14-34-3-1. The permit application must contain, among other things, a reclamation plan. I.C. § 14-34-3-3(17). Each reclamation plan must include a proposed use of the land following reclamation, and a description of the various steps necessary to achieve that proposed use. I.C. § 14-34-3-12.

After the mining and reclamation permit is approved but before it is issued, the applicant must file a bond for performance payable to the state and conditional upon faithful performance of all the requirements of the Indiana Code and the permit. I.C. § 14-34-6-1. In

order to secure release of the bond, the operator must notify certain parties, including adjoining property owners, and run a public notice advertising that the operator has applied for release of the bond. I.C. § 14-34-6-7. Within thirty days of receipt of a bond release application, the DNR must conduct an inspection and evaluation of the reclamation work involved. I.C. § 14-34-6-9. That evaluation must include:

> (1) The degree of difficulty to complete a remaining reclamation.
> (2) Whether pollution of surface and subsurface water is occurring.
> (3) The probability of continuance or future occurrence of the pollution.
> (4) The estimated cost of abating the pollution.

Id.

A person with a legal interest affected by the bond may file written objections and request a public hearing within thirty days. I.C. § 14-34-6-10. If the DNR is satisfied that the reclamation covered by the bond has been accomplished, then it may release the bond in three phases. I.C. § 14-34-6-13. Sixty percent of the bond may be released in phase I when the permittee completes backfilling, regrading, and drainage control in accordance with the reclamation plan. I.C. § 14-34-6-13. After revegetation has occurred, the director may release phase II of the bond. The final portion of the bond, phase III, may only be released when the permittee has "successfully completed all surface coal mining activities" and "all reclamation requirements of [I-SMCRA] are fully met." I.C. § 14-34-6-13. One of these duties is to ensure that:

> All debris, acid-forming materials, toxic materials, or materials constituting a fire hazard are treated, buried, and compacted or otherwise disposed of in a manner designed to prevent contamination of ground or surface water.

I.C. § 14-34-10-2(b)(17)(a).

Another requirement is to:

Minimize disturbances to the prevailing hydrologic balance at the mine site and associated offsite areas and to the quality and quantity of water in surface and ground water systems during and after surface coal mining and reclamation operations by doing the following:

> (A) avoiding acid or other toxic mine drainage by measures such as the following:
>
>> (i) Preventing or removing water from contact with toxic-producing deposits.
>>
>> (ii) Treating drainage to reduce toxic content that adversely affects downstream water upon being released to watercourses.
>>
>> (iii) Casing, sealing, or otherwise managing boreholes, shafts, and wells and keep acid or other toxic drainage from entering ground and surface water.

I.C. § 14-34-10-2(b)(13).

*Phase III Release*

The parties dispute the meaning of several of I-SMCRA's reclamation terms, specifically, the "pollution" the DNR must evaluate, I.C. § 14-34-6-9, the "toxic materials" of which SCCC must properly dispose, I.C. § 14-34-10-2(b)(17), and the "toxic mine drainage" that SCCC must avoid, I.C. § 14-34-10-2(b)(13). Musgrave argues that these terms do not have causal requirements, and therefore any material that could reasonably fall within the meanings of the words—in this case Alcoa's waste—must be evaluated by the DNR and remediated by SCCC, regardless of whether SCCC caused the pollution or not. SCCC and the DNR maintain that Alcoa's hazardous waste and any migration thereof falls within IDEM's jurisdiction.

Words and phrases in Indiana statutes shall be taken in their plain, ordinary, or usual sense, unless the construction is plainly repugnant to the intent of the legislature or of the context of the statute. I.C. § 1-1-4-1. However, an interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. LTV Steel Co., 730 N.E.2d at 1257. But an administrative agency does not have the power to make decisions properly committed to another agency. Id. An administrative agency has only those powers that the legislature has conferred to it, and unless we find the grant of powers and authority in the statute, we conclude that no power exists. Id.

The Commission[6] and Musgrave broadly interpret the DNR's requirement to evaluate pollution and toxic waste so as to include Alcoa's hazardous waste and the effect that SCCC's mining had thereon, but we think that this reading is in excess of DNR's powers, and is therefore unreasonable. The Indiana General Assembly has given IDEM, not the DNR, the duty to "regulate and require the proper and safe transportation, treatment, storage, and disposal of hazardous waste that is generated in or transported into Indiana." I.C. § 13-22-2-1. IDEM is also designated as the state agency to implement and enforce federal laws concerning hazardous waste. For example, IDEM is the solid waste agency for all purposes of the federal Resource Conservation and Recovery Act and is the agency tasked with implementing and enforcing the federal Comprehensive Environmental Response,

---

[6] Although the DNR supervises the administration and enforcement of I-SMCRA, I.C. § 14-34-2-3, the Commission is the "final authority" for the agency under AOPA except in consolidated proceedings with the Office of Environmental Adjudication and proceedings concerning the approval or disapproval, suspension, or revocation of a surface mining permit (but not reclamation bonds). I.C. § 14-34-2-2.

18

Compensation, and Liability Act of 1980 (CERCLA). I.C. § 13-13-5-1. Alcoa coordinated its dumping of hazardous waste with IDEM's predecessor. IDEM continues to work with Alcoa on monitoring the hazardous waste and the potential migration of water with waste constituents.

We therefore conclude that the DNR's duty under I-SMCRA to evaluate "pollution" and SCCC's obligation to properly dispose of "toxic materials" refers to those materials that result from surface mining. As for "toxic mine drainage", the term is defined in the Indiana Administrative Code as "water that is discharged from active or abandoned mines or other areas affected by coal exploration or surface coal mining and reclamation operations that contains a substance that through chemical action or physical effects is likely to kill, injure, or impair biota commonly present in the area that might be exposed to the substance." 312 IAC § 25-1-155. By its very name and definition, then, toxic mine drainage means water discharged as a result of mining operations. It does not include Alcoa's waste, which was dumped before SCCC started mining the bonded area at issue here.

The DNR determined that SCCC had completed all the necessary requirements for the phase III release on certain portions of the land. Before reaching this conclusion, the DNR held a public hearing and conducted a field investigation. The field investigation included an evaluation of the hydrological balance and confirmed that the surface water, ground water, and water impoundments were all acceptable. The report also concluded, among other things, that acceptable practices to control and minimize water pollution were implemented, pollution of ground water by drainage from acid and toxic-forming materials was avoided,

19

and the quality of impounded water is suitable for use. The quality in the bonded area had a pH level of between 6.5 and 7, and traces of metals were negligible.

The DNR therefore fully investigated whether pollution or other toxic materials resulting from mining were occurring or will occur in the future. If it is determined in the future that SCCC's mining spoil within the bonded area or elsewhere is indeed causing the spread of groundwater containing waste constituents, it will be the responsibility of IDEM— the agency tasked with such waste and its migration—to investigate and, if necessary, hold those responsible for remediation of damage. Insofar as the reclamation requirements of I-SMCRA are concerned, however, there is no genuine issue of material fact that they have been satisfied.

*Indiana Administrative Code and Reclamation Plan*

Musgrave also argues that SCCC's bond release was premature because it has not satisfied all the requirements of the Indiana Administrative Code. Pursuant to the Administrative Code, the DNR may release phase III of a surface mining reclamation bond only after the "operator has successfully completed all surface coal mining and reclamation activities required in IC 14-34, this article, *or* the permit." 312 IAC § 25-5-16 (emphasis supplied). According to Musgrave, the bond release is premature because:

> Surface mining activities shall be planned and conducted to minimize changes to the prevailing hydrologic balance in both the permit area and adjacent areas, to prevent material damage to the hydrologic balance outside the permit area, in order to prevent long term adverse changes in that balance which could result from those activities.

312 IAC § 25-6-12.

20

We are doubtful that the above rule is a *reclamation* requirement, as it only refers to planning and conducting activities. Even so, the Indiana Administrative Code requires that the operator satisfy the requirements of Indiana Code article 14-34, the Indiana Administrative Code, or the permit. 312 IAC § 2-5-16. As we have already discussed, SCCC met the reclamation requirements of Indiana Code article 14-34 and, as such, release of phase III is in compliance with the Indiana Administrative Code.

Finally, Musgrave contends that SCCC has not met all the requirements of its own reclamation plan. SCCC's plan states that "[i]n general non-coal waste will be hauled away from the mine by contract trash haulers" and that "[a]ny non-coal waste which remains after reclamation of the final pit will also be removed from the permit area for disposal." App. 827. "Non-coal wastes" include grease, lubricants, paints, flammable liquids, garbage, abandoned mining machinery, lumber, and other combustibles generated during surface mining activities." 312 IAC § 25-6-42. The definition of non-coal wastes clearly refers to wastes that were generated during surface mining activities. SCCC began mining the bonded area here after Alcoa finished dumping its waste, and we cannot agree with Musgrave that the reclamation plan's reference to non-coal wastes includes Alcoa's hazardous waste. Musgrave presents no error concerning SCCC's failure to comply with its reclamation plan.

## Conclusion

The trial court had jurisdiction to consider SCCC's petition for judicial review and did not err by refusing to dismiss it. Musgrave is not collaterally estopped from challenging the DNR's decision to release the bond on Permit S-008 because the jurisdictional issue

regarding Alcoa's hazardous wastes was not necessarily adjudicated in the prior proceeding. There is no genuine issue of material fact that SCCC met the phase III release requirements of I-SMCRA. SCCC has also satisfied the requirements of the Indiana Administrative Code and its own permit. The trial court's order reversing the ALJ's order and remanding for entry of judgment in favor of SCCC and the DNR is affirmed.

Affirmed.

BAKER, J., and DARDEN, J., concur.