

FILED

Jul 14 2015, 8:37 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

James P. Fenton
Kathryn A. Brogan
Eilbacher Fletcher, LLP
Fort Wayne, Indiana

Myra C. Selby
Ice Miller LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE FSSA

Gregory F. Zoeller
Attorney General of Indiana

David L. Steiner
Kyle Hunter
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
METHODIST HOSPITALS, INC.

Steven Jackson
Juliana Yanez
Faegre Baker Daniels LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Parkview Hospital, Inc.,

*Appellant-Plaintiff,*

v.

John J. Wernert, in his official capacity as Secretary of the Indiana Family and Social Services Administration,

*Appellee-Defendant,*

and

The Methodist Hospitals, Inc.,

July 14, 2015

Court of Appeals Case No. 02A03-1408-PL-296

Appeal from the Allen Superior Court

The Honorable Nancy Eshcoff Boyer, Judge

Cause No: 02D01-1212-PL-443

*Appellee-Intervening Defendant.*

## Brown, Judge.

Parkview Hospital, Inc. ("Parkview"), appeals the July 25, 2014 judgment of the trial court in favor of Indiana Family and Social Services Administration ("FSSA"), and Methodist Hospitals, Inc. ("Methodist," and FSSA and Methodist, together, "Appellees") on Parkview's petition for judicial review. Parkview raises two issues, which we revise and restate as whether the court erred in entering the July 25, 2014 order affirming the decision of the Secretary of FSSA regarding the denial of disproportionate share hospital payments to Parkview. We affirm.

## Background and Procedural History

FSSA administers the Medicaid program for the State of Indiana. Ind. Code § 12-15-1-1. Certain hospitals receive disproportionate share hospital ("DSH") payments, a related part of Medicaid, if the hospitals meet certain criteria and serve a disproportionate share of Medicaid recipients and other low income patients in accordance with Ind. Code §§ 12-15-16 through -19 and other state and federal laws. *See* Ind. Code § 12-15-17-1; 42 U.S.C.A. § 1396r-4; 42 U.S.C.A. § 1395ww(d)(5)(F). The federal government limits its financial participation by apportioning a specific DSH allotment for each state. *See* 42 U.S.C.A. § 1396r-4(f). FSSA may not implement a program until the federal

Centers for Medicare and Medicaid Services ("CMS") approves the provisions regarding the program in an amended state plan for medical assistance. Ind. Code § 12-15-15-10(d); Ind. Code § 12-15-16-5(a). FSSA may determine not to continue to implement the provisions relating to DSH payments if federal financial participation is not available. Ind. Code § 12-15-16-5(b).

[3] Ind. Code §§ 12-15-16 relates to a provider's eligibility to receive DSH payments. Ind. Code § 12-15-16-1(a) states that a provider is a disproportionate share provider if, in part, the "provider's Medicaid inpatient utilization rate is at least one (1) standard deviation above the mean Medicaid inpatient utilization rate for providers receiving Medicaid payments in Indiana." *See also* 42 U.S.C.A. § 1396r-4(b)(1)(A). Ind. Code § 12-15-16-2(a) provides:

> For purposes of disproportionate share eligibility, a provider's Medicaid inpatient utilization rate is a fraction (expressed as a percentage) where:
>
> > (1) the numerator is the provider's total number of Medicaid inpatient days in the most recent year for which an audited cost report is on file with the office; and
> >
> > (2) the denominator is the total number of the provider's inpatient days in the most recent year for which an audited cost report is on file with the office.

*See also* 42 U.S.C.A. § 1396r-4(b)(2) (providing in part "the term 'medicaid inpatient utilization rate' means, for a hospital, a fraction (expressed as a percentage), the numerator of which is the hospital's number of inpatient days attributable to patients who (for such days) were eligible for medical assistance

under a State plan approved under this subchapter . . . , and the denominator of which is the total number of the hospital's inpatient days in that period").

[4] Parkview entered into a provider agreement in 2011 with the State of Indiana pursuant to which it agreed to provide covered services to Indiana health coverage program members. The agreement provided in part:

> By execution of this Agreement, [Parkview] requests enrollment as a provider in the Indiana Health Coverage Programs. As an enrolled provider in the Indiana Health Coverage Programs, [Parkview] agrees to provide covered services and/or supplies to Indiana Health Coverage Program members. As a condition of enrollment, this agreement cannot be altered and [Parkview] agrees to all of the following:
>
> * * * * *
>
> 5. To provide covered services and/or supplies for which federal financial participation is available for Indiana Health Coverage Program Members pursuant to all applicable federal and state statutes and regulations.
>
> * * * * *
>
> 12. To abide by the Indiana Health Coverage Programs Provider Manual, as amended from time to time, as well as all provider bulletins and notices. Any amendments to the provider manual, as well as provider bulletins and notices, communicated to Provider shall be binding upon receipt. . . .
>
> * * * * *
>
> 18. To accept payment as payment in full the amounts determined by [FSSA] or its fiscal agent. . . .

Appellant's Appendix at 343.

[5] On December 18, 2009, the accounting firm of Myers and Stauffer CL ("Myers and Stauffer"), on behalf of FSSA, sent a letter to Parkview, and specifically to

the attention of Director of Reimbursement Eric Nickeson, and enclosed a DSH

eligibility survey form with instructions. The letter stated:

> Please find the enclosed survey form that must be completed in order to determine Indiana Medicaid Disproportionate Share Hospital (DSH) eligibility for the State Fiscal Years ending June 30, 2010 and June 30, 2011.
>
> * * * * *
>
> The survey must be completed and postmarked no later than **February 26, 2010**. Please compare information already entered into the survey for accuracy and provide support for any changes or additions. Please note that timely and accurate completion of the enclosed survey will expedite the completion of DSH eligibility and payment distributions.
>
> Please complete and return the enclosed survey to the address below. Surveys must be postmarked no later than February 26, 2010. This will be the only notification sent concerning the deadline. No second notification will be sent. **If the response to the survey is not received by the deadline, your facility will be deemed ineligible for DSH payments for SFY 2010 and 2011**.

*Id.* at 184. The instructions accompanying the survey stated in part:

> The enclosed survey is designed to collect the information necessary to administer the Indiana Medicaid Disproportionate Share Hospital program. This survey will be used to determine DSH eligibility for the State Fiscal Years (SFY) ending June 30, 2010 and June 30, 2011. . . .
>
> * * * * *
>
> This survey is **mandatory** and must be completed by each facility in its entirety. As a condition of participation in the Medicaid program, you are required, pursuant to your provider agreement, to submit to the Office of Medicaid Policy and Planning (OMPP) any information it deems necessary for the program. . . .
>
> * * * * *
>
> **Please complete and return the enclosed survey to the address below postmarked no later than February 26, 2010. This will be the only**

**notification sent concerning the deadline. No second notification will be sent. If the response to the survey is not postmarked by the deadline, your facility will be deemed ineligible for DSH payment for SFY 2010 and 2011. Only information submitted by your facility on a survey postmarked by February 26, 2010 will be included in your facility's DSH eligibility calculation.** Information received from your facility that is postmarked after the due date will not result in increased Medicaid days, payments or charges, etc. being included in the facility's Medicaid inpatient utilization rate or low income utilization rate (the ratios used to determine DSH eligibility.) In addition, failure to complete the survey may be considered a breach of the Medicaid provider agreement. If extenuating circumstances will prevent you from meeting the filing deadline, please contact Myers and Stauffer immediately at . . . .

* * * * *

For survey questions that ask for summary and/or supporting documentation, attach the required information. **This information must be provided electronically on CD, in the format presented in Exhibits A, B, C and D**. All documentation should be referenced back to the pertaining survey question. **Please maintain all source documentation used to complete the survey, as additional information (i.e., remittance advices, patient listings, etc.) may be requested to verify your numbers**. All providers are asked to compare the information already completed on the survey for accuracy. Please provide any additional information and submit documentation to support the additions. If there is any incorrect information included in the survey, please provide corrected amounts. You may do so in any format you would like (you may not be able to change the amounts in locked cells in the workbook). However, please note that any additional days or payments must be supported by detail reported in the formats illustrated by Exhibits A, B and C and submitted electronically. Please be advised that any questions that require support but do not have the required documentation **will not be used in the calculations** for DSH eligibility.

Please note that there is a change in the eligibility survey from past years as a result of the DSH Audit rule published in the Federal Register December 19, 2008. Crossover days (days for which a patient is eligible for both Medicaid and Medicare Part A) should now be

included in the Medicaid Inpatient Utilization Rate (MIUR).  This information is collected in Section B.

*Id.* at 186-187.  On February 26, 2010, Parkview submitted a response to the survey.

[6]     On June 18, 2010, Myers and Stauffer, on behalf of FSSA, sent a letter to Parkview and Nickeson which stated in part:

> This letter serves as notification from the Office of Medicaid Policy and Planning (OMPP) regarding your facility's eligibility to receive [DSH] payments for the State Fiscal Years (SFY) 2010 and 2011. Eligibility for DSH payments for this period is based upon information received from your DSH surveys and your Indiana Medicaid cost report ended between July 2008 and June 2009 (SFY 2009). . . .
>
> * * * * *
>
> There are three criteria[1] under which a facility can qualify for Indiana Medicaid DSH payments as follows:
>
> 1. Medicaid Inpatient Utilization Rate (MIUR)
>
> The MIUR is a percentage calculated as such:
>
> $$\frac{\text{The hospital's number of inpatient days attributable to patients who (for such days) were eligible for Medicaid}}{\text{The total number of the hospital's inpatient days in that period}}$$
>
> In order to qualify under this criterion, hospital's MIUR must exceed one standard deviation above the mean MIUR rate for hospitals receiving Medicaid payments in Indiana.  Therefore, in order to qualify under this criterion, your MIUR must be at least 32.94%.  Your facility's MIUR of 30.17% is calculated as follows. . . .

---

[1] This case involves Parkview's attempt to qualify for DSH payments under the MIUR criterion and not other criteria.

* * * * *

**Based on the information above, your facility is not qualified to receive DSH payments for SFY 2010 and SFY 2011**. . . .

* * * * *

This notification constitutes an appealable order. . . .

* * * * *

**Please note no new information can be accepted at this time. Only clarification and substantiation of information previously reported on your DSH eligibility survey is allowed. It is possible that another provider's appeal could result in a change in your eligibility status. In the event this occurs, we will promptly notify you**.

*Id.* at 201-202, 206-207.

[7]     On June 22, 2010, Nickeson on behalf of Parkview sent an e-mail message to Myers and Stauffer. The subject line of the message was "Medicare Crossover Days Omission," and the message stated:

> As you know, the SFY 2010-2011 Medicaid DSH survey handled Medicare crossover days differently than past surveys. In reviewing our information after receipt of the June 18, 2010 eligibility letter from Myers and Stauffer, we have discovered that a significant number of Medicare crossover days, both paid and unpaid, were mistakenly omitted from the Parkview Health facilities' SFY 2010-2011 Medicaid DSH surveys. We plan on filing an appeal in the next few days to properly include these Medicaid-eligible days on line 12 of the surveys for all of our facilities.
>
> Please let me know if you have questions or would like to discuss this issue. Thank you very much for your consideration.

*Id.* at 228.

In a letter to the Office of Medicaid Policy and Planning (the "OMPP") at FSSA dated June 30, 2010, and file-stamped as received on July 7, 2010, Parkview requested an appeal of the eligibility determination and indicated it would file a statement of issues. Parkview sent a letter to the OMPP dated August 5, 2010, stating that it was enclosing Parkview's statement of issues. In its statement of issues, Parkview argued in part that it was unable to report its Medicaid days accurately due to deficiencies in the survey created by Myers and Stauffer, and that "[t]he number of days underreported by Parkview due to the deficiencies in the Survey were not insignificant" and "in fact, they totaled 3,166 in-state Medicaid inpatient days."[2] *Id.* at 212. Parkview further argued that "[t]he OMPP's decision to include inpatient days attributable to those individuals dually eligible for both Medicare and Medicaid [] in the MIUR calculation was based on a flawed understanding of certain comments made by the [CMS] in the preamble to the DSH Final Rules published in 2008." *Id.* at 215.

Myers and Stauffer sent a letter dated December 10, 2010, to Parkview stating that it had received and reviewed the statement of issues in Parkview's appeal of the DSH eligibility determination. With respect to Parkview's claim that deficiencies in the survey caused it to underreport days, the letter stated that "as noted in the DSH Eligibility Survey instructions, only information submitted on

---

[2] In his subsequent affidavit, Nickeson stated that Parkview omitted 3,134 Medicaid inpatient days from its survey response.

the provider's DSH eligibility survey postmarked by the deadline was included in the eligibility calculations," and that "the DSH Eligibility Notification letter specified that no new information would be accepted." *Id.* at 222. In response to Parkview's argument that the OMPP's decision was based on a flawed understanding made by CMS, the letter stated that "[t]he DSH Audit Rule (Federal Register, Volume 73, No. 245, December 19, 2008), states on page 77912, 'The Medicaid Inpatient Utilization Rate (MIUR) is a calculation that includes all Medicaid eligible days. To the extent that an inpatient hospital day for a dually-eligible Medicare/Medicaid patient qualifies as a Medicaid day, that day would be included in the MIUR calculation.'" *Id.* at 224. The letter set forth the manner in which the MIUR is calculated and then stated:

> In order to qualify under this criterion, a hospital's MIUR must exceed one standard deviation above the mean MIUR rate for hospitals receiving Medicaid payments in Indiana. The original threshold, as listed in your Eligibility Notification Letter was 32.94%. However, changes to the MIUR calculations for your hospital and others, as a result of appeals and subsequent adjustments has resulted in a revised MIUR threshold. Therefore, in order to qualify under this criterion, your MIUR must be at least 32.51%. Your facility's original MIUR was 30.17%. Based on the adjustments listed above, your facility MIUR would be 30.34% and calculated as follows. . . .
>
> Revised MIUR                                         30.34%

*Id.* at 226. Myers and Stauffer's letter concluded that, based on this information, Parkview is not qualified to receive DSH payments for state fiscal

years 2010 and 2011. In a letter also dated December 10, 2010, Parkview submitted its statement of issues to an administrative law judge ("ALJ").[3]

[10] Parkview filed, with the ALJ, a motion for summary judgment together with designated evidence and a brief in support of the motion dated January 6, 2012. Parkview's designated evidence included, among other evidence, an affidavit of Nickeson which stated that he was the Director of Reimbursement for Parkview, that Parkview has qualified for Medicaid DSH payments since state fiscal year 2004, that since first qualifying for DSH Parkview has received more than $70.7 million in acute DSH and safety net hospital payments, and that Parkview has also continuously incurred a shortfall of approximately $198.8 million in revenue since 2004 from serving Medicaid and uninsured patients. Nickeson stated that the 2010 DSH survey was due on February 26, 2010, and that the instructions accompanying the survey indicated that any survey response postmarked after the deadline would result in an ineligible DSH determination by the OMPP. Nickeson's affidavit further stated:

> 7. Based on the clear language of the Survey instructions, I submitted the completed Survey response on behalf of [Parkview] in strict compliance with the instructions and deadline. In working with our contractor in preparing the Survey response, I relied on them to provide supporting documentation for many days believed to be includable, while I concentrated my attention on finishing other aspects of the Survey in order to meet the response deadline.
>
> 8. During final preparations of the Survey, the supporting documentation for the days was not available from our contractor. As

---

[3] The copy of the letter in the appellant's appendix is not file-stamped.

soon [as] it was apparent to me that the support would not be developed in time for submission, I did not consider contacting OMPP or Myers and Stauffer as I felt such attempts would be fruitless, as there were no extraordinary circumstances justifying the delay. My perception of the hard deadline was informed by the strict language of the Survey instructions.

9. On February 26, 2010, I submitted the report to the best of my ability based on the information available to me at the time of submission. I erred on the side of strict compliance with the deadline. Further, I acted conservatively in excluding over 3,000 days from the Survey. Although I believed the days were eligible Medicaid days, the requisite support was not fully developed by the deadline. According to the instructions, Medicaid days without full support would "not be used in the calculations for DSH eligibility."

10. I had no reason to believe that the OMPP would not strictly enforce the deadline and instructions in the Survey. Had I known at the time that the Survey instructions would not be as strictly enforced, I would have acted differently.

11. My decision resulted in the omission of 3,134 Medicaid inpatient days from the Survey, comprising of 2,391 in-state cross-over days and 743 out-of-state Medicaid-eligible days.

12. Accounting for the 3,134 omitted days, Parkview's MIUR would be 32.63%, which is .09% over the accordingly adjusted state MIUR eligibility threshold. But for the omission of these days, Parkview would have met the eligibility threshold for DSH payments. . . .

*Id.* at 93-94.

[11] Parkview also designated e-mail messages regarding White County Memorial Hospital. Melenie Sheehan of Myers and Stauffer[4] wrote an e-mail to FSSA which stated:

> White County [Memorial Hospital] reported an additional 43 Medicaid-eligible days. Survey instructions state, "Supporting information should include the patient name, Medicaid number, and dates of service. All support must be submitted electronically on CD, using the format in Exhibits A, B and C. Unsupported days and payments will not be used." White County provided an electronic Excel document with the patient RID, last four of SSN, and name. They did not include dates of service. We are unsure how you would like us to proceed in cases such as this, whereas days are reported and supporting documentation is provided, but incomplete. The handling of such cases in past eligibility determinations has been somewhat inconsistent; at times OMPP allowed additional support and other times, required a strict adherence to instructions and allowing only under appeal. I believe this has been due to OMPP's program goals at the time (timing, aversion to appeals, desire to encourage providers to submit consistently accurate information, etc.) and also has been impacted by changes in procedures (elimination of the Reconciliation letter which was used at one point to allow hospitals to respond to adjustments before the calculation was finalized).
>
> In order to test the 43 days for duplication and eligibility, we will need the dates of service, requiring us to contact the provider. The impact on White's eligibility is irrelevant . . . . The impact to the MIUR threshold is estimated to be a hundredth of a percent. We are unable to determine until the final MIURs are available, whether or not such a change in the threshold would impact another hospital's eligibility.

*Id.* at 115.

---

[4] In her affidavit, Sheehan states she was a certified public accountant for Myers and Stauffer and that, as part of the firm's duties as the Medicaid rate setting contractor for FSSA, Myers and Stauffer helped determine eligibility for funds distribution involving the DSH program.

[12] Sheehan's e-mail was forwarded to Pat Nolting[5] with FSSA, and Nolting wrote an e-mail message stating:

> Please go ahead and ask [Myers and Stauffer] to contact the provider for the dates of service, since it should be capped at the 43 additional reported days.
>
> Also, for the record we need to discuss Melenie's comment to the effect that the state has been inconsistent in handling these cases in the past. That is not true. We have been consistent within the context of the established procedures. At one time we had a process of write-backs, reconsideration, etc, which essentially caused the eligibility determination process to drag on for well in excess of a year. Under that process the scope of review was much different than is the case today. The current process establishes a deadline date for submitting all information (most notably days and income/charges), along with supporting documentation for additions to the MMIS data supplied by [Myers and Stauffer] on the survey document. If the provider fails to supply all substantiating documentation to their reported supplemental information, we have in the past contacted the provider for clarification and/or the missing documentation. We are not giving the provider an opportunity to add more days or payments/changes.

*Id.* at 114.

[13] In its brief in support of its summary judgment motion, Parkview argued in part that the exclusion of over 3,000 Medicaid days constituted an obvious error and that it is entitled to equitable relief. Parkview argued that, "[i]nduced by the 2010 Survey instructions, Nickeson concentrated his attention on ensuring that the Survey would be submitted by the deadline at all costs" and that, "[w]hile

---

[5] In its brief in support of its summary judgment motion, Parkview states that Nolting was the OMPP's Deputy Director.

he succeeded in submitting the Survey by the deadline, over 3,000 Medicaid days were excluded from the Survey response." *Id.* at 124-125. Parkview argued that, at the time of the survey, Nickeson was aware of some additional days that Parkview believed were includable but did not have any of the underlying support for those days, that as a result a total of 3,134 Medicaid days were erroneously omitted from Parkview's Survey, including 2,391 crossover days and 743 out of state Medicaid days, and that "[t]his omission represented over 7% of the hospital's total Medicaid days, a significant and obvious exclusion." *Id.* at 125. Parkview asserted that, in order to accomplish the objectives of the DSH program, it must be given relief to correct the error based on verifiable data that the hospital has served a disproportionate share of Medicaid patients during the eligibility determination period and that "Parkview's true and accurate MIUR, accounting for the omitted days, is 32.63%, which is .09% over the adjusted 32.54% MIUR DSH qualification threshold based on the December 31, 2010 calculation." *Id.* at 126. Parkview argued the exclusion of over seven percent of the hospital's Medicaid days is a significant omission, and clearly the result of plain error, and that it should be granted relief because the agency would not suffer prejudice by granting Parkview leave to amend and "the error affected the substantial rights of Parkview, as but for the denial to correct the obvious omission, Parkview would have been found DSH eligible." *Id.* at 127.

[14] Parkview further urged that relief is necessary to prevent manifest injustice and that, "[i]n effect, the erroneous completion of an administrative agency survey

amounts to an inadvertent regulatory violation, for which a multi-million dollar consequence is grossly excessive." *Id.* at 129. Parkview argued that the OMPP's conduct was arbitrary and capricious, and that the OMPP's inconsistent enforcement of the deadline and wildly varying interpretation of the survey instructions is a violation of the Indiana Administrative Orders and Procedures Act (the "AOPA"), and the OMPP must be estopped from its arbitrary strict enforcement and interpretation of the survey instructions against only Parkview. Parkview stated that strict interpretation of the agency policy against it, but not White County, a similarly situated hospital, is plainly arbitrary and capricious and that the "distinction between adding days as opposed to refining data after the deadline is wholly without merit" as "both actions will change the MIUR threshold in the end," the distinction "is not present in the Survey instructions or other agency communication," and the decision to allow White County to add omitted data "contradicted the policy established by the agency for the acceptance of DSH eligibility data." *Id.* at 136.

[15] Parkview also argued the OMPP's decision to include dually eligible Medicare/Medicaid patient days in the MIUR calculation was in error in part because state law, namely Ind. Code § 12-15-16-2(b)(3) at the relevant time, explicitly excludes dually eligible days. Parkview noted that the statute was amended effective July 1, 2011, but that was over a year after the initial DSH eligibility determinations were made.

[16] FSSA filed with the ALJ a response and motion for summary judgment together with designated evidence and a memorandum. In its memorandum, FSSA argued that the OMPP uniformly followed all of its own instructions and made adjustments based on the reported days that were filed with the survey as required. FSSA further argued that the OMPP properly interpreted the law and is entitled to summary judgment in its favor. FSSA asserted that federal law is controlling, that it provides that the MIUR includes a hospital's number of inpatient days attributable to patients eligible for Medicaid regardless of whether that patient was also eligible for Medicare, that Indiana's state plan as approved by CMS is consistent with this language, and that every hospital was subject to the same process and was instructed the same on the dual eligible-days treatment from the outset of the process. FSSA argued that the provider agreements are binding and that, under paragraph twelve of the agreement, providers agree to abide by all bulletins and notices.

[17] An affidavit of Melenie Sheehan of Myers and Stauffer designated by FSSA stated that, with respect to the Medicaid inpatient days Parkview did not timely report, to her knowledge the OMPP made no exceptions to the instructions that were sent to the hospitals and treated all of the hospitals in the same manner, that hospitals were allowed to provide explanatory or supporting information on days that had been reported, but they were not allowed to report new days that had not previously been reported. Sheehan's affidavit further stated that, unlike the case with Parkview, White County had already reported the additional days on their original survey submission, but their supporting detail

was missing some information required to verify the additional days, that the OMPP merely allowed White County to provide additional data elements to support the days they had already reported on the survey, and that the OMPP distinguishes between allowing a provider to submit additional elements of data for days already reported on the survey as in the case of White County as opposed to allowing new days to be submitted that were not included in the original survey response as in the case of Parkview. The affidavit also stated that Indiana's State Plan includes a definition of the MIUR that requires including dually-eligible or crossover days. Sheehan's affidavit also stated: "It is my understanding that if the 'dually-eligible' days were excluded from the calculation, Parkview would still not be eligible for DSH participation." *Id.* at 182.

[18] On September 20, 2012, the ALJ issued an order and recommendation. The ALJ's order found in part that Parkview notified Myers and Stauffer "[o]n June 26, 2012" that it had discovered a significant number of crossover days and that "Parkview cannot submit newly discovered [evidence] two years after the initial survey was due and after being notified that it did not qualify for DSH funds."[6] *Id.* at 349. The ALJ further concluded that "[t]he undisputed facts show White County Hospital was asked to clarify information regarding days that it had

---

[6] The ALJ's order cited to an exhibit in support of this finding. The exhibit contains the June 22, 2010 e-mail message by Nickeson on behalf of Parkview to Myers and Stauffer stating that Parkview had discovered that a significant number of Medicare crossover days were mistakenly omitted from the Parkview Health facilities' SFY 2010-2011 Medicaid DSH surveys.

already submitted; it was not given the opportunity to submit more days," that "White County Hospital was not treated any differently than Parkview Hospital," and that "[n]either hospital was permitted (or allowed) to submit additional days after the February 26, 2010 deadline." *Id.* at 349-350. The order provided in part:

> 5. . . . . At the time Parkview's DSH eligibility was established[,] I.C. 12-15-16-2(b) (2010) required that days attributable to dually eligible individuals (individuals eligible for both Medicaid and Medicare) were to be excluded from the MIUR calculation when calculating the denominator of the DSH fraction.[7]
>
> * * * * *
>
> 7. I.C. 12-15-16-2(b)(3) (2010) was not consistent with federal law. In 2010 Federal Medicaid law provided that dually eligible patients were to be excluded when calculating the denominator of the DSH fraction.
>
> * * * * *
>
> 11. On December 19, 2008, [CMS] published in the Federal Register an amended version of 42 CFR § 447. The commentary to the amended rule in two different places speaks to the calculation of the MIUR and whether or not dually eligible individuals should be included in the MIUR calculation. Medicaid Program; Disproportionate Share Hospital Payments, 73 Fed. Reg. 77904 (December 19, 200[8]) (amending 42 CFR § 447).

---

[7] A footnote here stated:

> P.L. 53-2011, effective on July 1, 2012, [sic] removed the following language regarding dual eligible patients: "However, a day is not a Medicaid inpatient day for purposes of this section if the patient was entitled to both Medicare Part A (as defined in 42 U.S.C. 1395c) and Medicaid on that day." Effective July 1, 2012 [sic] state law became consistent with federal law (as set out below).

Appellant's Appendix at 351 n.1. We note P.L. 53-2011 was effective on July 1, 2011, and not on July 1, 2012.

12.  In § "4. Dual Eligible" in response to comments that days attributable to dual eligible should be included in the MIUR calculation CMS stated:

> The Medicaid Inpatient Utilization Rate (MIUR) is a calculation that includes all Medicaid eligible days.  To the extent that an inpatient hospital day for a dually-eligible Medicare/Medicaid patient qualifies as a Medicaid day, that day would be included in the MIUR calculation.

Id. at 77912.  In response to the next comment questioning whether the costs attributable to dual eligible patients should be included in the MIUR calculation,[8] CMS responded:

> We disagree; since Section 1923(g)(1) does not contain an exclusion for dually eligible individuals, we believe the costs attributable to dual eligibles should be included in the calculation of the uncompensated costs of serving Medicaid eligible individuals.

Id.

13.  Only in the context of discussing methodologies used by states that use an alternate DSH eligibility criteria did CMS indicate that it was permissible for states not to include dually eligible individuals.  Id. at 77919 (middle column).  The comment was referring to a question regarding states that use alternative qualifying.  The commentary further indicated: "With respect to the statutory MIUR [as opposed to an alternative methodology], it is a calculation that includes all Medicaid eligible days."  Id.

* * * * *

15.  . . . .  42 U.S.C. §1396r-4(b)(2), as interpreted by CMS to exclude dually eligible patients when calculating DSH eligibility for federal Medicaid funds, pre-empts language in the 2010 version of I.C. § 12-15-16-1 that provided otherwise. . . .

---

[8] Specifically, the comment provided in part: "The commenter indicated that, since Medicare is the primary payer for the duals, it seems appropriate to exclude the costs of those patients from this calculation, since the payments are also excluded."

*Id.* at 351-353. The ALJ ordered that there were no material issues of fact in dispute and that FSSA is entitled to summary judgment in its favor.

[19] On October 5, 2012, Parkview filed a petition for review of the ALJ's order and requested review by the Secretary of FSSA. In the petition, Parkview argued that it had filed reports with the State of Indiana in 2008 and 2009 which contained information about all inpatient admissions and third party payor sources and, consequently, that the State had in its possession the relevant data pertaining to Parkview's erroneously omitted Medicaid days. Parkview argued that the ALJ drew an incorrect conclusion as to the inclusion or exclusion of inpatient hospital days attributable to dually eligible individuals by the OMPP in its calculation of the MIUR. Parkview also argued it notified Myers and Stauffer of its discovery of the omitted dually eligible days within four months of the due date of the initial survey and not after two years as found by the ALJ. Parkview asserted that the ALJ did not address the issue that the OMPP should account for the Medicaid days that were erroneously excluded from Parkview's survey in the MIUR calculation and that, but for this obvious omission, Parkview would have qualified as a DSH provider for fiscal years 2010/2011, and that it is entitled to equitable relief.

[20] On November 20, 2012, the Secretary of FSSA, as the ultimate authority for FSSA/OMPP, entered a Decision of the Ultimate Authority Designee which affirmed the decision of the ALJ. The decision of the Secretary of FSSA adopted the conclusions of law of the ALJ's order with several corrections. The decision found that paragraph 5 of the ALJ's order should read: "At the time

Parkview's DSH eligibility was established[,] I.C. 12-15-16-2(b) (2010) required that days attributable to dually eligible individuals (individuals eligible for both Medicaid and Medicare) were to be excluded from the MIUR calculation when calculating the *numerator* of the DSH fraction." *Id.* at 38 (emphasis added and emphasized word reflecting correction). The decision also found that paragraph 7 of the ALJ's order should read: "I.C. 12-15-16-2(b)(3) (2010) was not consistent with federal law. In 2010 Federal Medicaid law provided that dually eligible patients were to be *included* when calculating the *numerator* of the DSH fraction." *Id.* (emphases added and emphasized words reflecting corrections). The decision concluded that the ALJ was correct to grant the motion for summary judgment submitted by FSSA/OMPP based on the evidence that the requirements of the survey clearly stated that all responses had to be submitted no later than February 26, 2010, and the survey responses timely submitted by that date did not justify granting DSH status to Parkview. The decision also stated that the "[s]o called newly discovered evidence, submitted almost two years later, was untimely and not appropriate to consider." *Id.* The decision further found that "[t]hose portions of the decision of the ALJ and the parties' arguments on the subject of the appropriate method for determination of the [MIUR], while fascinating, is irrelevant," that "[t]he information timely provided by Parkview on the survey submitted on or before February 26, 2010 did not demonstrate a MIUR sufficient to merit DSH status," and "[a]ll other evidence tendered was untimely and not relevant." *Id.*

[21] On December 20, 2012, Parkview filed a verified petition for judicial review of FSSA's decision with the Allen County Superior Court. Parkview alleged that the decision of the Secretary of FSSA was arbitrary, capricious, not supported by substantial evidence, and not in accordance with law because of inconsistent enforcement of the DSH eligibility survey deadline and instructions, and inconsistent application of the OMPP's policies and procedures for DSH determinations; that the OMPP failed and refused to consider material evidence pertaining to the inclusion of days; and that FSSA's decision is contrary to public policy establishing that hospitals such as Parkview, which serve a disproportionate number of low-income patients, are entitled to adjustment payments. Parkview also alleged the decision was in excess of the authority of the OMPP and short of Parkview's statutory rights because the OMPP's decision to include inpatient days for those patients dually eligible for Medicare and Medicaid in the MIUR calculation contradicted state law and the state plan in effect at that time. Methodist sought to intervene, and the court granted the request on November 19, 2013. The parties submitted briefs to the trial court in support of their positions.

[22] In its brief, Parkview argued among other things that FSSA's decision has imposed an inequitable forfeiture. In support of this assertion, Parkview argued in part that it has substantially performed its contractual obligations of serving Medicaid patients in a sufficient number of patient days to be entitled to the compensation provided by the DSH funds and that, even if its failure to submit the proper documentation by a deadline date imposed unilaterally by the State

does constitute a breach of contract, the millions of dollars of which the State would deprive Parkview are entirely out of proportion to the harm, if any, that flowed from Parkview's breach. Parkview argued that the consideration for Parkview's promise to abide by the provider agreement was the State's obligation to compensate Parkview for its Medicaid services. Parkview noted that, within one or two business days after receipt of the June 18, 2010 letter from Myers and Stauffer, on June 22, 2010, it informed the State of the undercount of Medicaid patient days.

[23] In its brief, Methodist argued that Parkview cannot forfeit what it never possessed, that it did not qualify for DSH payments, and that it failed to comply with the provider agreement. In its brief, FSSA argued that equitable relief is inappropriate, that there was no forfeiture, that Parkview had no existing interest in DSH funds, that a hospital has no automatic right or freestanding entitlement to the grant, and that Parkview did not forfeit any interest in its Medicaid provider agreement. FSSA also contended that, even if equitable principles should be applied, a party may lose its right to relief through its own negligence, that Nickeson's June 22, 2010 e-mail message stated that Parkview discovered a significant number of days were mistakenly omitted from the surveys, that Nickeson's later affidavit indicates he knew about the missing days when Parkview submitted its survey, and that regardless of the post hoc explanations, it is evident that any negligence is attributable to Parkview.

[24] On May 27, 2014, the court held a hearing on Parkview's petition for judicial review at which the parties presented arguments. When asked how Parkview

could forfeit something it never had, Parkview asserted that the law of forfeiture is not limited to property in possession but also applies to money earned, that it had an interest in the money it had earned as a disproportionate share hospital, and that it earned the DSH payments it was denied. Parkview contended that hospitals that obeyed the instructions, like itself, were penalized.

[25] FSSA argued that Parkview did not have a vested interest and that Parkview's assertion is that as a matter of law anyone who should qualify should be able to go back and reopen proceedings after ineligibility is determined. FSSA noted that White County Hospital did submit supporting data, there were a few fields that were missing, and that for the sake of completeness Myers and Stauffer obtained the missing information to confirm them. FSSA argued that it wished to limit the universe of appeals and that, if it permitted Parkview to submit more days after the deadline, it would open up cascading appeals with everyone else if they were right on the line and that this could be a never-ending process.

[26] Methodist argued that granting the relief Parkview seeks would be inequitable to Methodist, that Parkview waited four months and hoped its submission was good enough to receive a payment, that it then used words like "mistake" and "omission," that it was not a mistake for Parkview to fail to submit the additional days but a deliberate considered act of a veteran of the process, and that Parkview did not take the step of contacting Myers and Stauffer if it had concerns or extenuating circumstances. *Id.* at 47. Methodist asserted that Parkview never explained what was going on, whether its consultant was negligent, or whether Parkview was waylaid, and that a party asking for equity

needs to provide all of the facts so the court can determine where the equities might lie. With respect to Parkview's argument about an entitlement or vested interest, Methodist further contended that Parkview was fully compensated for all of the care it rendered to Medicaid patients, that Parkview received $44,900,770 and did not provide care for free, that Parkview suffered no equitable forfeiture, that more than seventy-five percent of the hospitals in Indiana do not receive DSH funds, and that there was no reasonable expectation or entitlement to DSH funds. It argued that the fact that a hospital provided the same amount of Medicaid days as the previous year is meaningless and only relevant in relation to the other hospitals, and there is no possible expectation because the hospital would have to know the care provided by the other hospitals.

[27] On July 25, 2014, the trial court entered an order affirming the decision of FSSA's ultimate authority, including that FSSA properly followed its own rules and procedures when it declined to consider the patient days Parkview submitted after the DSH survey deadline. The court concluded that Parkview did not show that it was treated differently than any other hospital in the calculation and that, specifically, the record showed that White County Hospital was permitted to submit certain documentation after the deadline, but that information did not affect either White County Hospital's DSH eligibility or the amount of DSH funds paid to it. The court also concluded that for a number of reasons, Parkview has not established a valid claim for equitable forfeiture. Further, the court noted that Parkview's failure to submit the

inpatient days by the deadline was not an inadvertent error but rather a willful act that bars Parkview from having the attributes of a party claiming equitable relief; that Parkview was paid all of its 2010-2011 Medicaid funds of nearly forty-five million dollars for provision of care to the Medicaid population and therefore Parkview suffered no forfeiture or loss in its provision of services to the Medicaid population; and that Parkview did not possess a right to DSH payments because, among other reasons, timely completion of the survey was a prerequisite to eligibility and Parkview cannot forfeit what it never possessed. The court concluded that it would not be equitable for Parkview to recover DSH payments at the expense of several other hospitals that timely and correctly completed their surveys, and that Parkview willingly refused to avail itself of a request for additional time to submit additional information, and its delay in exercising this option precludes equitable relief.

[28]     The court also concluded that, "[t]o the extent there is a proper contract claim here, Parkview did not use the available method of contacting FSSA's contractor about obtaining relief for 'extenuating circumstances'" and that "Parkview having not used this 'safety valve' provision of the 'contract,' the Court will not engraft an additional 'safety valve' that is not already written in the contract." *Id.* at 17. The court denied Parkview's petition for judicial review and affirmed the decision of the Secretary of FSSA.

## Issue and Standard of Review

[29] The issue is whether the trial court erred in entering its July 25, 2014 order affirming the Decision of the Ultimate Authority Designee regarding FSSA's denial of DSH payments to Parkview.

[30] When we review the decision of an administrative agency, we are bound by the same standard as the trial court. *Parker v. Ind. State Fair Bd.*, 992 N.E.2d 969, 976 (Ind. Ct. App. 2013) (citing *Musgrave v. Squaw Creek Coal Co.*, 964 N.E.2d 891, 899 (Ind. Ct. App. 2012), *trans. denied*). We do not try the case *de novo* and do not substitute our judgment for that of the agency. *Musgrave*, 964 N.E.2d at 899. We will reverse the administrative decision only if it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Ind. Code § 4-21.5-5-14(d); *see also Musgrave*, 964 N.E.2d at 899. While an appellate court grants deference to an administrative agency's findings of fact, no such deference is accorded to its conclusions of law. *Musgrave*, 964 N.E.2d at 899-900 (citing *LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1257 (Ind. 2000)). The burden of demonstrating the invalidity of the agency action is on the party who asserts the invalidity. Ind. Code § 4-21.5-5-14(a); *see also Musgrave*, 964 N.E.2d at 900.

[31]     The order of the ALJ was entered on cross motions for summary judgment. In an administrative proceeding, a party may, at any time after the matter has been assigned to an administrative law judge, move for a summary judgment in the party's favor as to all or any part of the issues in the proceeding. Ind. Code § 4-21.5-3-23(a); *Musgrave*, 964 N.E.2d at 900. When a party files a summary judgment motion, the administrative law judge considers the motion as a court would if considering a motion for summary judgment filed under Trial Rule 56. Ind. Code § 4-21.5-3-23(b); *Musgrave*, 964 N.E.2d at 900.

[32]     Pursuant to Indiana Trial Rule 56(C), summary judgment is appropriate when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. *Musgrave*, 964 N.E.2d at 900. A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue. *Id.* The party moving for summary judgment bears the burden of making a *prima facie* showing that there is no genuine issue of material fact and that he or she is entitled to a judgment as a matter of law. *Id.* Once the moving party meets these two requirements, the burden shifts to the non-moving party to show the existence of a genuine issue of material fact by setting forth specifically designated facts. *Id.* The fact that the parties made cross motions for summary judgment does not alter our standard of review. *Id.* Instead, we consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

## Arguments of the Parties

[33] Parkview contends that it is entitled to relief since FSSA's final decision on Parkview's DSH's eligibility was arbitrary and capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence. It argues that the trial court's findings ignored the evidence and that: "Perhaps the most egregious omission in the trial court's findings is its failure even to mention the fact that Parkview's claim was based on specific provisions of its binding contract with the State, the very same contract which the State claimed gave it the right to enforce its DSH instructions and procedures against Parkview in the first place." Appellant's Brief at 21. It also argues that the court found that Parkview "intentionally omitted" more than 3,000 Medicaid patient days from its survey but "ignor[ed] the fact that the survey instructions stated that days such as these should not be submitted if a provider lacked the required documentation." *Id.* at 22.

[34] Parkview further contends that, "[u]nder contract law, the State could not arbitrarily enforce its 'procedures' where those procedures were not material to the contract and resulted in forfeiture." *Id.* at 23. It points to paragraphs 5 and 12 of the Medicaid provider agreement[9] and argues in part that it is undisputed

---

[9] The provider agreement stated in part:

> As a condition of enrollment, this agreement cannot be altered and [Parkview] agrees to all of the following:

* * * * *

that, had Parkview's Medicaid days been considered by FSSA, Parkview would have received DSH funds, that "Parkview was prima facie entitled to receive payment of those DSH funds from the State," that there are forty-five paragraphs in the provider agreement imposing voluminous obligations on Parkview, that during the trial court proceedings FSSA never once claimed that Parkview violated any of those specific provisions, and that Parkview has never denied that paragraph 12 is binding or that the DSH instructions are enforceable, but that "the question presented here is whether under the law of contracts the DSH instructions are enforceable where to do so results in a substantial forfeiture, and where those instructions ultimately were not material to the vitality of the contract as a whole." *Id.* at 24-25.

[35] Parkview maintains that it is entitled to relief under Sections 229 and 241 of the Restatement (Second) of Contracts,[10] and that, under Section 229, it is entitled

---

5. To provide covered services and/or supplies for which federal financial participation is available for Indiana Health Coverage Program Members pursuant to all applicable federal and state statutes and regulations.

\* \* \* \* \*

12. To abide by the Indiana Health Coverage Programs Provider Manual, as amended from time to time, as well as all provider bulletins and notices. Any amendments to the provider manual, as well as provider bulletins and notices, communicated to Provider shall be binding upon receipt. . . .

Appellant's Appendix at 343.

[10] Section 229 of the Restatement (Second) of Contracts provides:

Excuse of a Condition to Avoid Forfeiture. To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Section 241 provides five factors to consider in determining whether a breach of contract is material:

to relief once it establishes that depriving it of DSH monies constitutes a "disproportionate forfeiture," and that the burden then shifts to FSSA to establish that compliance with the instructions was a "material part of the agreed exchange." *Id.* at 27. Parkview asserts that it has established its right to relief under Section 229 and Indiana law as a matter of law, or, at the very least, has established disputed material issues of fact. With respect to the trial court's finding that Parkview cannot forfeit what it never possessed, it argues that the court misunderstood the law of forfeiture and that forfeiture may occur if a party is deprived of compensation, even if it was never in possession of that which has been forfeited, and points to Restatement § 229 cmt. b.[11] Parkview further argues that the forfeiture constitutes a disproportionate forfeiture, that there is no evidence establishing that harm to the State could justify depriving Parkview of twenty-seven million dollars or more in DSH funds, and that the State does not even assert that it suffered any loss whatsoever as a result of

---

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

[11] Restatement §229 cmt. b provides that "the denial of compensation that results when the obligee loses [its] right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange."

Parkview's conduct, let alone a loss even remotely comparable to the loss suffered by Parkview.

[36] Parkview also notes that the court failed to engage in any analysis of whether Parkview had committed a material breach. Parkview asserts that, by any measure, the State has not been deprived of any benefit for which it bargained when it entered into the provider agreement with Parkview as all of its Medicaid patients were properly cared for, that the State has never even asserted that it has suffered any monetary loss as a result of Parkview's conduct, that the State seeks to deny Parkview the supplemental DSH monies in the millions of dollars that it had fully earned, and that this presents a forfeiture entirely disproportionate to whatever harm the State may ever assert. Parkview states it not only promptly offered to cure, but by August 5, 2010, it had actually cured any defect in its performance. It posits that, "[u]nder these circumstances and under Indiana law, Parkview's failure to report its additional 3,134 Medicaid days by the February 26, 2010 deadline cannot be regarded as a material breach of a condition of the Medicaid Provider Agreement, discharging the State's obligation to pay DSH monies to Parkview." *Id.* at 36.

[37] Parkview also argues it gained nothing by failing to submit its additional Medicaid days by the deadline and therefore it had no motive for any behavior that did not comport with good faith and fair dealing, and that it simply attempted to abide by FSSA's own written instructions. Parkview asserts that it did not have the documentation supporting its additional days by the February 2010 deadline, that the DSH instructions stated that a count of days could not

be submitted without the support, that many of the days for which Parkview lacked documentation were crossover days and this was the first year that these dual-eligible days were included in the DSH calculation, that "[a] reasonable inference from Eric Nickeson's affidavit testimony is that, although he knew these cross-over days existed, he was not aware of their significance," and that in prior years Parkview had always met the MIUR threshold for DSH and the effect of including the crossover days was unknown. *Id.* at 41. Parkview contends the survey instructions were very clear that Parkview could not submit a count of its additional days without simultaneously providing this supporting data, that Nickeson testified that was his interpretation of the instructions, that perhaps Nickeson committed an error of judgment in not asking for relief from the DSH survey deadline but such an error does not establish willful misconduct, and that the trial court's reference to a "safety valve" provision in the contract did not absolve the court of its duty to analyze any of the contract issues in the case. *Id.* at 45.

[38]    Parkview also contends FSSA did not adhere to the written instructions, that instead it permitted hospitals to submit a count of days by the deadline and then submit supporting data after the deadline, and that the actual undisclosed policy of the OMPP was that, after the deadline, hospitals were allowed to provide explanatory or supporting information on days that had been reported, but were not allowed to report new days that had not previously been reported. Parkview argues that, had it been aware of the actual unwritten rule, it would have been able to comply with that instruction by the February 26, 2010

deadline, and that it follows that failing to comply with the written DSH instructions could not have been a breach material to the agreed bargain under Sections 229 or 241 of the Restatement. Parkview asserts that FSSA's issuance of inaccurate and misleading instructions was arbitrary and capricious. It argues that the agency's decision should be reversed because the ALJ and FSSA misstated the undisputed facts and denied Parkview's appeal of its eligibility determination based on a gross exaggeration of Parkview's delay in submitting its Medicaid days information to FSSA as it is undisputed that no more than two business days after receiving the June 18, 2010 letter Parkview sent an email on June 22, 2010 informing Myers and Stauffer that Parkview had determined that a number of Medicaid crossover days had been mistakenly omitted from its Survey. Parkview requests this matter be remanded with instructions to accept its additional Medicaid patient days or remanded for an evidentiary hearing to address any disputed issues of material fact.

[39] Among many other assertions, FSSA argues that all hospitals in Indiana were notified of and subject to the same deadline and standards, and that it is reasonable to assume that FSSA may need to reach out to hospitals after the February 26, 2010 deadline to clarify information they provided or resolve issues or discrepancies that arise. It maintains that what Parkview suggests is not reasonable and would lead to an unmanageable debacle which would allow for an inundation of new, post-deadline information from the providers who did not qualify attempting again to qualify, effectively creating a second wave of submission for all hospitals without a set deadline, and that the standards

established by FSSA are reasonable and adherence to those standards is not arbitrary and capricious.

[40] FSSA argues that it uniformly applied and adhered to its established standards, that Parkview's comparison between White County and itself is misplaced, that White County submitted days without some supporting documentation before the deadline, that Parkview submitted additional days long after the deadline, and that the survey instructions, in form and practice, prohibit the use of days not submitted before the deadline.

[41] In addition, FSSA maintains that Parkview waived its contract claims and in any event this case may not be analyzed under contract principles because nothing in the existing provider agreement gave Parkview any right to receive DSH payments. FSSA asserts that a review of the record indicates that Parkview did not advance claims based on contract principles before the agency, and such claims should now be disregarded because they were not initially raised.

[42] FSSA argues that there was no disproportionate forfeiture in any event, and that the trial court aptly noted there was no equitable forfeiture for a number of reasons, including Parkview's willful actions in the submission of what it later contended was an incomplete survey, its receipt of full payment for Medicaid services it actually rendered, the need for timely completion of surveys, the inequity to other hospitals if DSH funding was now extended to Parkview because the other hospitals' share would diminish, and Parkview's failure to

request more time to submit its survey if it needed the time for extenuating circumstances. It notes that DSH payments can be significant, Parkview was no novice in requesting such payments, and that if something changed in the way the survey was to be prepared this was all the more reason to request an extension if an extension was warranted.

[43] Among its many arguments, Methodist asserts that, if this court reaches Parkview's equitable arguments, it should find they are insufficient for reversal, that DSH payments are not an entitlement, and that DSH funds are not earned compensation but are akin to a bonus for treating a disproportionate share of Medicaid patients. Methodist argues that, because Parkview's original submission fell short of establishing it qualified for DSH payments, Parkview demands special treatment. Methodist contends that contractual principles such as forfeiture do not apply as Medicaid is not governed by a private agreement between two parties but by numerous state and federal regulations, that Parkview cannot show clean hands to obtain equitable relief as it knew at the time of its DSH survey that it was excluding 3,134 days, and that Parkview has pointed its finger to a contractor who did not have documentation for dual-eligible claims by the deadline but does not explain why this occurred. Methodist also states that allowing Parkview to qualify for DSH payments would create a cascade of appeals.

[44] In its reply brief, Parkview argues in part that Appellees' briefs repeatedly construe the facts and inferences in favor of the ALJ's ruling granting summary judgment to FSSA rather than correctly construing all facts and reasonable

inferences in favor of Parkview as the non-movant. It contends that FSSA's position ignores and undermines the entire purpose of the DSH statute which is intended to provide financial assistance to hospitals that serve a disproportionate number of Medicaid and low income patients, and that this court should reject the position that Parkview's administrative error, one which was entirely capable of being rectified, should produce the a harsh result of depriving Parkview of twenty-seven million dollars.

## Discussion

[45] The December 18, 2009 letter and instructions accompanying the DSH eligibility survey form to Parkview stated that the survey must be completed and postmarked no later than February 26, 2010, and the survey instructions stated that only information submitted in a response postmarked by February 26, 2010, would be included in the facility's DSH eligibility calculation. The survey instructions also expressly stated that "there is a change in the eligibility survey from past years as a result of the DSH Audit rule published in the Federal Register December 19, 2008," and that "Crossover days (days for which a patient is eligible for both Medicaid and Medicare Part A) should now be included in the Medicaid Inpatient Utilization Rate (MIUR)." Appellant's Appendix at 187.

[46] Parkview submitted its response to the survey on February 26, 2010, and Myers and Stauffer, on behalf of FSSA, sent a letter dated June 18, 2010, to Parkview which stated that Parkview was not qualified to receive DSH payments for

fiscal years 2010 and 2011, that "no new information can be accepted at this time," and that "[o]nly clarification and substantiation of information previously reported on your DSH eligibility survey is allowed." *Id.* at 207. Several days later, on June 22, 2010, Nickeson, on behalf of Parkview, sent an e-mail message to Myers and Stauffer stating in part that, "[i]n reviewing our information after receipt of the June 18, 2010 eligibility letter from Myers and Stauffer, we have discovered that a significant number of Medicare crossover days, both paid and unpaid, were mistakenly omitted from the Parkview Health facilities' SFY 2010-2011 Medicaid DSH surveys" and that Parkview planned to file an appeal to include those days in its survey response. *Id.* at 228. In his affidavit, included in Parkview's designated evidence in support of its summary judgment motion, Nickeson stated in part that, "[b]ased on the clear language of the Survey instructions," he submitted Parkview's survey response "in strict compliance with the instructions and deadline," that "[i]n working with our contractor in preparing the Survey response, I relied on them to provide supporting documentation for many days believed to be includable," that "[a]s soon [as] it was apparent to me that the support would not be developed in time for submission, I did not consider contacting OMPP or Myers and Stauffer as I felt such attempts would be fruitless, as there were no extraordinary circumstances justifying the delay," and that his "perception of the hard deadline was informed by the strict language of the Survey instructions." *Id.* at 93-94.

[47] These facts are not disputed, and there is no dispute that, based on the information Parkview submitted by the February 26, 2010 deadline, it was determined that Parkview was not eligible for DSH payments. As revealed by the procedural history set forth above, while it challenged the issue at the agency level and in its petition for judicial review, Parkview does not present arguments on appeal regarding whether crossover or dually-eligible inpatient days were properly considered in making the MIUR calculations or regarding the impact of any state law in effect at the time of the initial DSH eligibility determinations which required the exclusion of such days in calculating the MIUR, and thus we do not disturb the conclusions of the ALJ and Secretary of FSSA on this issue.

[48] We turn to Parkview's arguments regarding FSSA's decision not to consider any Medicaid inpatient days Parkview submitted or wished to submit subsequent to the February 26, 2010 deadline.

### *Arbitrary, Capricious, or Unsupported by Substantial Evidence*

[49] With respect to Parkview's argument that the decisions of the ALJ and Secretary of FSSA were arbitrary and capricious as it was treated differently than White County Memorial Hospital, we note that the instructions accompanying the survey stated that the survey was mandatory and requested the facilities to complete and return the survey postmarked no later than February 26, 2010. Significantly, the survey instructions specifically stated "[o]nly information submitted by your facility on a survey postmarked by

February 26, 2010 will be included in your facility's *DSH eligibility calculation*" and "[p]lease be advised that any questions that require support but do not have the required documentation will not be used *in the calculations for DSH eligibility*." Appellant's Appendix at 186-187 (emphases added). These instructions make it clear that any inpatient days Parkview wished to be considered in making an eligibility determination were required to be submitted as a part of its responsive survey postmarked no later than February 26, 2010, and that no information received after that date would be considered in making an eligibility determination.

[50] White County submitted forty-three inpatient days for which it had not provided dates of service. Following the scheduled deadline, Myers and Stauffer, at FSSA's direction, asked White County for this information. However, as acknowledged at oral argument and found by the trial court, White County was eligible for DSH payments without taking into consideration the inpatient days for which it had not provided dates of service. Sheehan's email message to FSSA stated in part that White County reported an additional forty-three days without dates of service and that "[t]he impact on White's eligibility is irrelevant . . . ." *Id.* at 115. Once White County was determined to be eligible for DSH payments based upon its inpatient days submitted with all required information by the scheduled deadline, White County was permitted to supplement its documentation upon request by providing dates of service, which could have impacted its share of the available DSH funds, and this was not in contravention of the survey instructions. *See id.* at 186-187 (the survey

instructions provided "Please maintain all source documentation used to complete the survey, as additional information (i.e., remittance advices, patient listings, etc.) may be requested to verify your numbers"). Parkview, on the other hand, failed to submit over 3,000 inpatient days which it desired for FSSA to consider in making an eligibility determination by the scheduled deadline and, as a result, was found to be ineligible for DSH payments. We cannot say that the decision of the Secretary of FSSA was arbitrary or capricious on the grounds Parkview was treated differently than White County.

[51] Also, Parkview states that exhibits containing supporting documentation necessary to verify its additionally-requested inpatient days were attached to its August 5, 2010 statement of issues, and FSSA states that the record only conclusively shows that Parkview submitted the additional days on December 10, 2010. Thus, to the extent the findings of the ALJ and Secretary of FSSA suggest Parkview did not submit documentation for the inpatient days it wished for FSSA to consider until two years after the initial survey deadline, those findings are not correct. Nevertheless, we cannot say that these findings render the decision of the Secretary of FSSA unsupported by substantial evidence. Parkview did not submit supporting documentation for the additional inpatient days it wished for FSSA to consider in calculating its MIUR until at least August 5, 2010, several months after the February 26, 2010 deadline set forth in the instructions, and Parkview did not notify FSSA or Myers and Stauffer of the possible crossover days until four days after it had received FSSA's June 18,

2010 letter notifying it that it was not eligible for DSH payments for the applicable period.

[52] Based upon the designated evidence before the ALJ and Secretary of FSSA, we cannot say that the decision of the Secretary of FSSA as the ultimate authority designee was arbitrary, capricious, or unsupported by substantial evidence.

### *Excuse of a Condition to Avoid Forfeiture*

[53] We next turn to Parkview's argument that it had a contract with FSSA and that it suffered a disproportionate forfeiture, as contemplated by the Restatement (Second) of Contracts, when it failed to submit all of its inpatient days by the deadline established by FSSA.

[54] The designated evidence does not support the conclusion that a contract or agreement existed between FSSA and Parkview which governed DSH payments or eligibility for DSH payments, and Parkview is not entitled to relief on the basis of a forfeiture of a reasonably-expected contract benefit. The Medicaid program in general, and the DSH payment program in particular, is not governed principally by one or more agreements by or between hospitals and states or the federal government, but instead is administered in accordance with a number of federal and state laws and regulations. While Parkview agreed to certain terms in the Medicaid provider agreement and there may have been other existing agreements related to health coverage programs and hospital reimbursements, the designated evidence does not show there was an agreement, contained within the Medicaid provider agreement or elsewhere,

between FSSA and Parkview pursuant to which FSSA agreed that, in exchange for Parkview providing services to Medicaid-eligible patients, Parkview would receive DSH payments for the state fiscal years 2010 and 2011, or which otherwise contained material terms and conditions regarding DSH payments or eligibility for DSH payments to providers and the amount of those payments.

[55]  Under the regulations referenced above, whether a particular provider is or will be eligible for DSH payments and the amount of those payments in any particular year turns on the provider's MIUR relative to the mean MIUR for providers receiving Medicaid payments in Indiana, and the MIUR calculations are made using the information provided to FSSA by the providers. Thus, the eligibility determination for any provider was dependent upon the provider's compliance with the administrative processes established by FSSA as the agency administering the Medicaid program for the State of Indiana. DSH eligibility and payment determinations were not governed by any contract or agreement between FSSA and providers. Accordingly, Parkview does not have a contract claim against FSSA or any claim related to excuse of a condition to avoid forfeiture under the Restatement (Second) of Contracts § 229.

[56]  In addition, a Medicaid provider does not know whether it will be eligible for DSH payments until the MIUR calculations for all providers receiving Medicaid payments in Indiana are completed and the mean MIUR and standard deviation calculations are completed. Based upon the designated evidence, a Medicaid provider could not have reasonably expected to become eligible for DSH payments unless it submitted all of its inpatient days, including

crossover or dually-eligible inpatient days, prior to the February 26, 2010 deadline.

[57] The designated evidence shows there was no contract or agreement of material terms and conditions between FSSA and Parkview regarding DSH payments or eligibility for DSH payments and thus Parkview does not have a contract claim against FSSA and is not entitled to relief on the basis of a forfeiture of a reasonably-expected contract benefit.

## Conclusion

[58] Based upon the record, the decision of the Secretary of FSSA was not arbitrary, capricious, or unsupported by substantial evidence. In addition, there was no contract or agreement of material terms and conditions regarding DSH payments supporting a forfeiture claim.

[59] For the foregoing reasons, we affirm the July 25, 2014 judgment of the trial court affirming the decision of the Secretary of FSSA.

[60] Affirmed.

Riley, J., and Robb, J., concur.